of the day and we will have Ms. Utrecht on the phone as appellee. Is that right Kim? Ms. Utrecht, can you hear us? We'll just make sure Ms. Utrecht can hear us. I think that's an important part of the process. Ms. Utrecht? Yes, sorry. I heard someone speaking but I wasn't quite sure what was being said. But I am here. Thank you. Just making sure you can hear us. Thank you. I heard that much better. Thank you, Your Honor. We'll look forward to your presentation. So we'll call the next case, final case of the day, number 22-50145. Restaurant Law Center, Texas Restaurant Association v. United States Department of Labor, et al. First we'll hear from Mr. DeCamp for the Restaurant Law Center, et al. Good morning. Good morning. May I please look forward? For most workers in our economy, it has long been the case that all of the earnings they receive from their employment come in the form of direct wages paid directly from their employer. For certain employees— Make sure you're speaking up, please. For certain employees, they receive, in addition to wages directly from the employer, cash in the form of tips from customers. When the Fair Labor Standards Act first came to apply to restaurants and hospitality businesses in 1966, what Congress created was the tip credit provision in Section 3M of the Fair Labor Standards Act. And what Congress did in that provision is to recognize the common sense notion that to have minimum wage compliance, when you have employees who are receiving two different forms of wages, income directly paid by the employer and cash from customers, that it was fair and appropriate to treat some of those tips as satisfying the minimum wage obligation. To put those minimum wage workers and the tip workers on equal footing with respect to minimum wage compliance. So they had the tip credit provision. And the tip credit provision, that obviously has been briefed extensively here, but the Department looked at a section of that law. Section 3T of the Fair Labor Standards Act defines who can qualify for this tip credit provision. And very simply, what Congress said is, if you are a tipped employee, if you are somebody who, in your occupation, you receive on a regular basis more than a de minimis amount of tips— originally $20 a month, roughly $5 a week, later went up to $30 a month. That's the current standard, so about $7 a week in tips. If you receive that level of tips on a fairly consistent basis, then it is fair and appropriate for the employer to treat a portion of those tips as satisfying the minimum wage obligation. That's the definition of tipped employee in Section 3T. What the Department did here in the regulation, though, was to go off in a very different direction. The Department said, well, the term occupation and the phrase engaged in an occupation is ambiguous. And therefore, we are going to define—we, the Department, are going to define eligibility for this tip credit provision, who is a tipped employee, based not on what is your occupation, based not on whether you are engaged in an occupation, but instead on a wholly different concept of whether you are engaged in a tipped occupation. Can I ask you—so the district court obviously denied a preliminary injunction on the basis of a lack of irreparable harm, and so I think that's the— for my purposes, that's the principal question for us. And the court's holding, although it's a fairly short opinion, I think has multiple aspects. One of those aspects that jumped out at me is the contention that the current rule is merely a codification of a longstanding practice, the 80-20 rule, and so therefore, there really couldn't be significant compliance costs because, well, you were already having your client, your restaurants, who were already having to comply with the 80-20 rule. So essentially, what are the compliance costs today? So I have other questions about the district court's opinion, but I'd like to hear your reaction to that seems important aspect of the court's opinion. There's a few responses to that. The first is that the Department of Labor itself quantified these costs in its rulemaking, in the Federal Register and the final rule, and the department itself quantified those costs as about $220 million in the first year and about $177 million in ongoing annual costs to employers for the next 10 years. So the department said there are very substantial costs. With regard to, well, what are those costs? The challenge here, and this has been the challenge on 80-20 for a long time. I've been working with restaurants on this issue for about 15 years. Restaurants will tell you, we already comply with it. Our servers don't spend that much time on cyber. Our people are spending most of their time working with customers. The problem is we don't have records to prove it, and because of that, it leaves businesses exposed to class and collective actions. Without records showing how much time an employee spends on this task, that task, the other task, you might think, and it may be the case as an employer, that you are complying with 80-20, but all it takes is one or two or three plaintiffs alleging in a complaint that, well, I spent more than 20% of my time. If I understand what you said, under the previous iteration of the rule, leave it to one side or the other, it's the same as the rule today. You're saying, yes, the rule is in place, but restaurants do not need to do record-keeping? The rule has never formally required record-keeping, whether under the previous iteration or now, under some regulatory form that it existed in from the beginning. How was it promulgated before? Was it an amicus brief? Originally, yes. There was an opinion letter in 1979. There were two more opinion letters that built the predicate for the 80-20 concept. The 80-20 concept itself first appeared in the Field Operations Handbook. That's an internal agency guide to investigators for how to conduct investigations. That was in 1988. That was not a public document. If you wanted it, you could not get that document. It first became, I think, available to the public by way of FOIA in the 1990s. It was not widely known. That rule, that 80-20 concept, the Department of Labor, my understanding is that at least until 2010 or later, the Department never conducted a single investigation asserting an 80-20 violation. So this was relatively unknown within the regulatory community. It wasn't until 2007 and the decision in the District Court that this issue became something that people knew about, a national promise. I was at the Department of Labor at that time. I had been at the Department about two years, and I had never heard of that issue until past examples, and I was running the agency that enforces this thing. So nobody knew about this. Okay, well, back to recordkeeping. Why would there be recordkeeping required now when it wasn't before? There's not a de jure recordkeeping requirement. The regulation doesn't require it. However, what we've seen in case after case now is if you don't have those records, that's fine, but you leave yourself as an employer exposed to massive litigation where the plaintiffs can come in, argue that they spent more time than the threshold on these non-tip tasks, and then the plaintiffs are off to the races in the case. If you don't have the records, the plaintiffs then come in and say, well, you didn't keep your records, therefore we're not able to proceed on the basis of our testimony, and you have to disprove it, but by hypothesis you don't have the records. And so as a de facto matter, this regulation really forces employers to maintain these records not because you have a recordkeeping violation, but because you get slaughtered in litigation if you don't have records. So it forces employers to change their practices significantly, either to not have employees performing these non-tip tasks or to keep records of the time spent on those tasks. Nobody yet has devised a way to keep the records of those tasks, at least those that occur during a shift. It's not that hard. We're talking about things happening at the very start of the day before the rest are over. You can keep track of those blocks of time. That's manageable. But when we're talking about activities that happen during the course of the shift, when somebody goes from serving customers, now they're going to spend five minutes rolling napkins, and then they're going to do other things, nobody has found really there's no technology existing today that can do that. Even the Department of Labor's own timekeeping app that it makes available to the public cannot track those tasks. So this is not something that's technologically feasible, and that's what creates the hazard for employers. They have to change their practices on the risk of bankruptcy-level litigation because we've seen business after business going out of business because of these 80-12 suits. More so since the pandemic, because now we have restaurants whose capital is depleted, they can't afford to defend the suits, the transaction costs of defending these suits, and I've spent most of my time defending employers in an LLC litigation. Let me just, I don't mean to belabor this, but I just want to make sure I understand. What are the, is there a meaningful difference between the rule today, which is a notice and comment rule, right? And the sub-regulatory guidance, as you put it, that was in effect for some undefined amount of time in the past. Is there a meaningful difference in what restaurants must do to comply? Yes. Among other things, there is now a, in addition to 80-20, there is a 30-minute standard where an employee spends a continuous block of time of 30 minutes or more on non-tipped activity. Then even if the employee never reaches 20% of the work week spent on non-tipped activity, the employer loses the ability to take the tip credit for the time in excess of the 30 minutes. You can't take the tip credit for the 30-minute block or the 30-minute and more block? The more. If it's a 35-minute block, you can take the tip credit for the first 30 if it's under the 20%, but not for anything in excess of the 30. So let me get back to the, so that's one thing. The district court also made some evidentiary, I guess, findings that your evidence is not good or credible. Do you need to have evidence of specific restaurants, specific member organizations, and their ongoing compliance costs in order to demonstrate irreparable harm? Certainly not, Your Honor. I think, again, we come back to the best evidence here of irreparable harm is what the Department of Labor itself said in the rulemaking. We're not trying to say that the costs are greater than what DOL said, but what the Department of Labor said is that on an ongoing basis, even after the first year, it's $177 million a year in compliance costs. That was 2019 dollars. Today, in 2022 dollars, that's over $200 million a year. So that's one piece of it. A second piece is when we're talking about differences between the earlier 80-20 and now, the department has now, for the first time, said that even if you have not tasks that are outside your occupation, but if you have a server doing nothing but serving customers and then standing there and waiting for customers to come in the door, the time the server is waiting for customers to come in the door, not cleaning things, not doing anything else, but just waiting, that counts against that 20%. So if the restaurant is slow on a given day or for the week and the server does nothing but serve customers and wait for customers, the employer can still lose the tip credit. And that's true for servers. That's true, as one of the amici pointed out, for in the gaming industry when you have table games dealers that will be on for 40 minutes or 60 minutes and then off for 20 minutes, that off for 20 minutes under the department's view counts toward the 20%. The department had never said that before. So this is not about two different jobs, two non-overlapping jobs, which was the genesis of the 80-20 originally in the 1967 rulemaking. This is about a single job where employees could be spending 100% of their time doing tasks appropriate for that job. So what is your best authority for the proposition that let's assume for the purposes of argument that there are compliance costs associated with complying with the new rule. What is your best case for the proposition that those compliance costs are irreparable harm for purposes of a preliminary injunction? It's really two. It's BST Holdings against OSHA from this court from 2021 and Texas against EPA. In both of those cases, this court, citing a language from a concurrence from Justice Scalia, said that compliance costs with an invalid regulation almost always amount to irreparable harm. When we look at the evidentiary findings, the district judge didn't suggest that these restaurants, and this is one example of Tracy Vaught, the president of H-Town Restaurant Group. He quibbled with the million dollars that she claimed she would incur per year if she had to abandon the tip credit. But the alternative that even the judge offered was, well, couldn't she just hire five employees or more and have the employees stand there and count on the pad the time that people spend on these different tasks, which is a six-figure-a-year cost because they have five restaurants and that would require at least ten employees. The idea is you're not going to get that money back if the regulation is in effect. Well, sure, and that's the sovereign immunity point. We cite wages and white line investments for that proposition. There is no remedy available. Any costs of spending at this point are gone, or if they go out of business. There's no way to recover that. The Chamber of Commerce against Edmondson from the Tenth Circuit said that when you have a trade association whose members are going to suffer even $1,000 a year in harm. So if we agreed with you, what should we do? What's the remedy here since, as I understand it, this thing is briefed up on summary judgment below? It's briefed up on summary judgment, but I think that it's important that the issues that remain here do not require factual development. The record is fully developed here. This court long ago, in 1989, recognized in White against Carlucci that when you have an injunction appeal and a district judge has ruled on one or more of the factors but not all of the factors, this court can consider and can rule on the other factors if the record is fully developed and if a remand would serve no useful purpose. Another great case on this is the Tenth Circuit's decision in Hobby Lobby Stores Incorporated against Sebelius where the circuit there obviously did some things that dealt with this issue and decided sooner or later. I remember that. But is the district court poised to rule on this? We have a hearing scheduled for January. We don't know what the court's timing on a ruling on that will be. And honestly, it's a pure issue of law at this point. And the issue, if it goes back to the district court, it's going to have to come back up anyway because whoever loses is going to appeal. As a matter of efficiency, if this court doesn't rule and address the merits now, it's really encouraging district courts to frustrate appellate review by not giving complete rulings, not suggesting anything untoward on the part of the district court here, but to allow a district court's decision not to fully address the factors in the preliminary injunction to delay and to impede appellate review. Does the district court in the briefing have additional materials that were not before it on the merits of the rule? No. Okay. Same record. Same record. Okay. And then the additional piece is the major questions piece. That's obviously a new holding that came down before the government filed its brief on this appeal. We did brief it in the reply. It's not a new issue, but it's a new argument as to why the ruling, the regulation here is invalid. So we think that we can talk about that, but that's an important part of this because this ruling imposes billions of dollars on an industry that encompasses about 14% or about 14.7 million people in about 10% of the U.S. workforce, and that's in the record. Okay. Thank you, counsel. Thank you. We'll have time for rebuttal. Okay, Ms. Utrecht, we're grateful that you can appear by phone. We're sorry about your health situation. Hope you're feeling okay. Can you hear me okay? I can, Your Honor, and I appreciate. I just want to start by saying I very much appreciate you giving me the opportunity to present remotely, and I regret not being there in person. Also, I want to let you know that my connection is very faint. I can hear you, but if I ever speak over any of you, I apologize. It's certainly not my intention, and I will try to speak as slowly as possible to make sure that, you know, the technological difficulties hopefully don't get in our way. Can you hear me okay before I start? We will do our best, and we just encourage you to speak slowly and speak up. We're anxious to hear your arguments, so please. All right. Great, Your Honor.  Jennifer Utrecht on behalf of the Department of Labor. Your Honor, plaintiffs here seek the extraordinary remedy to preliminarily enjoin a rule that has now been in effect for a year that largely codifies an approach to the TIP credit that has been in place for decades. Plaintiffs claim this is warranted based on alleged compliance costs, but the district court evaluated that claim after an evidentiary hearing that included cross-examination of plaintiffs' declarants and found that plaintiffs' allegations of irreparable ongoing compliance costs were simply not credible. Can I ask you something, Ms. Utrecht? I've read your brief, and you make that argument very compellingly. Let's put aside the evidence in the declarations for one moment and talk about the fact that in the rule, the department itself quantifies compliance costs, ongoing compliance costs with the new rule. Why isn't that enough to find irreparable harm? Assuming, of course, that the rule is invalid, but why isn't that alone enough to find irreparable harm under our cases which say that compliance costs under a regulation that, if declared invalid, are irreparable? A few responses, Your Honor. First, I would urge this court to look at what the department actually said in the rule, which is, and I'm referring to 86 Fed Reg 60141-143, which is the discussion of the costs in the department's cost-benefit analysis. And what the department there said is that some employers, not all of them, but some, are going to incur management costs in the form of 10 minutes per week. But that, in fact, many employers would not incur any compliance costs at all because the rule was largely codifying the guidance that had been in place for a very long time. Most employers were familiar with the 20% threshold, and that was what was being codified in the rule. And so many employers would not need to make any changes to their businesses at all. And the second response— What about the 30-minute aspect of the new rule? Isn't that a new aspect of the rule that an employer would have to adjust to? Your Honor, it's true that the 30-minute requirement is the only real new aspect of the rule. The 30-minute requirement, and just as a background principle to make sure we're all on the same page, the 30-minute requirement is a requirement that says that when an employee engages in work that does not produce tips for 30 or more continuous minutes, so that's a clear, discrete chunk of time where the employee is not even arguably providing customer service, then that is more than half of the hour, and the employer should not be able to take the tip credit for that hour because during that hour the employee was not in fact engaged in tip-producing work. And what the Department of Labor said about that requirement in particular is that 30 minutes is a clear and discrete chunk of time. It's often time that is used for things like meal breaks. It's easily trackable. It doesn't require any sort of burdensome tracking to know, well, did I send someone to, you know, stalk the back room for 30 continuous minutes with no breaks where tip-producing services is provided? Do you agree that the employer is going to have to track that? So track is a—I want to make sure that we're using terms—we're on the same page about what terms mean. Track is a difficult word. So the only record-keeping requirement that I'm aware of with respect to the tip credit, and this is a record-keeping requirement that does not arise from the rule, it is a separate regulation, is that employers have to keep track of which hours the employee works that qualify for the tip credit and which do not. And so with that respect, you know, if an employer knows in advance that it is assigning a waiter, for example, to go do something for 45 minutes that does not involve customer service, the employer should not take the tip credit for that hour. I don't know if that's a—I would not qualify that as a burdensome requirement in terms of record-keeping or tracking. It's just a question of on or off. Am I taking the tip credit or am I not taking the tip credit for that period of time? But if the employer is sued or if there's some enforcement action brought against the employer on the basis of you are claiming tip credit for hours that are not allowed, for time that is not allowed under the 30-minute rule, won't the employer have—if the employer doesn't want to—wants to defend itself, wouldn't it have to show that it, in fact, did not do that through its records? No. Not necessarily, Your Honor. I mean, there are plenty of private litigation in which mere testimony from employers themselves could help establish that the employer was, in fact, keeping with the requirements. So if there were a fight, for example, about this 30-minute requirement, the employer could say, I do not—this is obviously all hypothetical, but the employer could say, we do not assign employees to discrete chunks of time like that. Any time they are doing directly supporting work is in conjunction with also providing customer service, and all of that time counts as tip-producing time. Therefore, it's not a 30-continuous minute—it would not implicate the 30-minute requirement. So all that is to say, Your Honor, that, again, the 30-minute rule is the only truly novel thing about this regulation. But I would emphasize also that plaintiffs, neither in their briefing before this court nor in their evidentiary showing before the district court, claim that the sort of tracking burdens or the compliance cost burdens of which they are complaining arise from the 30-minute requirement. In fact, I think their arguments are far more broad than that and go towards the 20 percent threshold that is not at all new. There's no allegation or showing that there's any additional cost that is associated with this 30-minute temporal requirement, and it would be difficult for them to suggest that given that the 30-minute requirement is such a discrete and easily noticed chunk of time. Okay, I understand that. That's helpful. So just one more question on compliance costs. Help me understand why in the rule the Department says that over 10 years, the compliance will have an average annual cost of $183.6 million, et cetera. So I take it that we have to concede that there are some compliance costs. Where is the Department getting that estimate, if you can speak to that? I'm sorry, Your Honor, when the Department says there's 186? I'm sorry. I'm just asking about the cost summary in the rule in the Federal Register page 60143. It's the $183 million estimate for average annual cost of compliance. I'm just asking, where is the Department getting that? So I would answer, I think, in the context that precedes that statement. The Department looked to how many employers across affected industries, there are across affected industries, which is 470,894 potential employers. And then it breaks down as it goes through the rule, the rule familiarization costs, which are estimated at approximately one hour per employer. Those familiarization costs, the District Court found, should already have been incurred by these employers. The adjustment costs, again, one hour per employer times the 470,000 possible employers. Again, costs that should already have been incurred by employers. And then finally, the management costs, which the Department estimated as 10 minutes per week per employer on average times the 490,000 employers. But with respect to those total costs, it's only the estimated management costs that are the ongoing potential costs. And again, as I mentioned, the Department made quite clear that not every employer, in fact many employers, would not incur these costs. These are only costs for people who have to make changes to the way they task employees on certain things in order to continue taking the TIP credit. And what we would expect to see here for plaintiffs to justify their burden of showing irreparable harm to justify the extraordinary remedy of a preliminary injunction would be for plaintiffs to show that even one of their restaurants has, in fact, made these changes or has to make this sort of change. And not even that showing was made before the District Court here. Okay. Thank you. So I'm sorry, Your Honor, I don't have lights in front of me, so I'm not sure where my time is. But assuming that I still have time, perfect. Assuming that I still have time, as we emphasized in our brief, we don't think it's necessary for this court to address the merits. Obviously the only question that was addressed by the District Court here was irreparable harm, and the District Court did not abuse its discretion in finding that plaintiffs' allegations were unsupported and uncreditable on that score. But because plaintiffs have spent a significant portion of their time today discussing the merits, I'd like to address them briefly. Please. It's important to keep in mind, I believe as plaintiffs even recognized in court today, that, as I said, there's very little that is new about this rule. I would urge this court to look to the courts of appeals decisions, Ninth Circuit's decision on Bonk in Marsh, the Eighth Circuit's decision in Fast, and the Eleventh Circuit's decision in Rafferty, all of which explain very clearly that since even the 1967 dual jobs regulation, the Department of Labor has taken a consistent position that an employee is not engaged in an occupation that regularly and customarily receives a certain amount of tips unless the employee is in one of two situations. The first is the employee is actually engaged in work that produces tips, and the second is that the employee is engaged in tasks that are related to tip-producing work for part of the time. The 1967 dual jobs regulation used the term part of the time. There's always been this question of at what point is a person engaged in so much non-tipped-producing work that they have passed this threshold into actually engaging in a second occupation for which the tip credit cannot be taken. And what this regulation does, what the 80-20 guidance before it does, is define that amount of time to say when you have stopped engaging in the occupation. It's entirely consistent with the statute and entirely consistent with the precedence that has come before this case for the department to define what it means to be engaged in an occupation in that way. The plaintiff's contrary position here is that we should define what it means to be engaged in such an occupation really based solely on a person's job title and that anything that that employee does, so long as they have a certain job title like waiter, count and should qualify for the tip credit. But that can't be reconciled with long-standing understanding, neither in the 1967 dual jobs regulation, nor with any of the decisions that upheld the 80-20 guidance. Indeed, Rafferty, which happened after the Department of Labor had already rescinded the 80-20 guidance, said there has to be some delineating mark. It can't just be everything that an employee does that counts as being part of the occupation. And so for that reason, the regulation is entirely consistent with the statute. It's not at all arbitrary. And unless your honors have any additional questions on the merits, I would urge this court to affirm the district court's decision here. Thank you. Could you update us on where you think the district court is right now procedurally, just to make sure we're getting all this out? My understanding, Your Honor, is that the case has been reassigned to a different judge who had scheduled oral argument on the summary judgment motions for the second week of January. And that is, I believe that's where things stand. Oh, I'm sorry. I missed that. It's been assigned to a different judge. I didn't know that. Okay. I believe that's a new development, like a very, very recent within the last few weeks development. Okay. Great. Thank you. Do you have anything else? No, Your Honor. That is all. Thank you. The panel has no further questions. Thank you, counsel. I appreciate your, we appreciate your hearing. I appreciate your flexibility. Thank you, Your Honor. Of course. Okay. Great. Mr. McCann, why don't you have five minutes for all. Thank you. One thing to note when we talk about this long-standing position that DOL has is it's very important to understand the department has changed its position 180 degrees four times since 2009. This is not a situation where an agency has had a long-held, consistently held, unchallenged view. This has been very controversial since the world found out about this 820 rule in 2007. It has been actively litigated, and the department has gone back and forth. It's become a political football, and that's an important context here. With regard to the Department of Labor's view on compliance costs, that assessment, that $177 million, that hinges on the belief that there are no record-keeping obligations. Obviously, if there are record-keeping obligations, the cost will be substantial. We don't have that quantified, but I think that's important to note here. The department itself recognizes that the ongoing management costs of 10 minutes per week per establishment, and there are about 470,000 establishments that the department's rulemaking recognizes this rule would apply to. That's the average cost. That is a huge cost going forward. We heard in the government's argument the concern that, well, if you spend half an hour or more on time, the employer shouldn't be able to take on non-tech tasks during the hour. The employer shouldn't be able to take the minimum wage credit for that hour. But that's never been how the courts have looked at minimum wage. Minimum wage compliance has, for about the past 60 years, been uniformly recognized in the circuits, including in the Fifth Circuit, as a week-by-week analysis, a work-week-by-work analysis. We don't look at minimum wage compliance minute-by-minute, hour-by-hour. We look at it on the work week as a whole. That is the Klinghoffer decision in the Second Circuit as to how that started. In the Fifth Circuit, there's a case called All Vanilla Goes Coast to Coast from 2011. That's a very well-established proposition. So it's alien to FSA analysis to suggest that we ought to be slicing and dicing the work week into tip credit time and non-tip credit time and have different minimum wage analyses like that. In the argument we heard from the government, the department basically admitted that the employer, in one way or another, must keep track of the time that the employees spend, at least in these 30-minute blocks of time or longer. That's obviously a record-keeping obligation. The 30-minute piece, contrary to what the government said, is not the only piece of this. Again, the idea that idle time, that alone now, counts toward the 20%. That's very important. That is a whole different world that makes it very difficult to track. Where would I find idle time? Do you have to, as you say, a new Federax number? It is, yes, Your Honor. We have a slice of the record. I can keep them up. Well, that's great. You have them in the brief. That's definitely in the brief. It's also important to note that under the department's analysis, every type of employee is now engaged in at least two, if not more, occupations. That is never how the Congress understood occupations. Well, from the Congress in 1966, it said that if an employee is engaged in an occupation in which he customarily and regularly receives at least $20, then $30 a month in tips, they never thought that we'd end up in this metaphysical analysis of when it's a server and not a server. And maybe if the server is mauling lawns for all day, okay, that doesn't matter. We do metaphysics all the time here, counsel. But this is a notoriously simple statute. It's not a difficult statute. Could you compare it to the dual jobs regulations? Yes. And so in your view, what's going on now, is it different from the dual jobs? Very much so. Very much so. So the dual jobs regulation in 1967 posited two non-overlapping jobs performed by the same employee for the same employer, one tip, one non-tip. The employee was a hotel, essentially, janitor, a maintenance man, who also served as a server in a hotel restaurant. And what the DOL said, and it's not especially controversial at the time, is you can take a tip credit for the time as a server. You can't take a tip credit for the time spent as a maintenance person. We can question whether that can positively, I will say, arguably be consistent. But it was not a big deal because nobody does that. Nobody was taking a tip credit for the time somebody spent as a janitor. So it was no problem. Where it all went off the rails is when the department then tried to apply that notion to a single occupation, like server, and sliced and diced a single occupation, like server, like that. That was in 1820. That was in 1820. Sliced and diced that into multiple occupations where it's one job, not multiple jobs. It's not what Jejikuda – I read that case in March. Jejikuda is contesting that the 1820 is a valid, or I forget if it was set up to have or not. Right. So all of the cases that have been cited here, so when we're talking about March, when we're talking about Grafferty, and we're talking about FAST, those are all our cases. They're not Chevron cases. They're our cases dealing with the subregulatory interpretation of the former dual-jobs regulation. So this is a very different stable posture. Well, thank you for a very well-argued case. If you have any further questions from the panel, we'll take them out under submission. And that concludes our oral arguments for today. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.